**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────

Robert T. S., Jr.,

                              Plaintiff,

            v.

                                        No. 5:21-CV-38
COMMISSIONER OF SOCIAL SECURITY,        (CFH)

                              Defendant.

─────────────────────────────

**APPEARANCES:**                    **OF COUNSEL:**

Binder, Binder Law Firm              CHARLES E. BINDER, ESQ.
485 Madison Avenue, Suite 501
New York, New York 10022
Attorney for plaintiff

Social Security Administration       MICHAEL L. HENRY, ESQ.
625 J.F.K. Federal Building,
15 New Sudbury Street
Boston, Massachusetts 02203
Attorney for defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**MEMORANDUM-DECISION AND ORDER[1]**

        Robert T. S., Jr.[2] ("plaintiff") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("the

Commissioner") denying his application for disability insurance benefits.  See Dkt. No. 1

─────────────────────

[1] Parties consented to direct review of this matter by a Magistrate Judge pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 72.2(b), and General Order 18.  See Dkt. No. 5.
[2] In accordance with guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in 2018 to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify plaintiff's last name by initial only.

("Compl."). Plaintiff moves for reversal and remand for the determination of benefits. See Dkt. No. 15. The Commissioner cross moves for judgment on the pleadings. See Dkt. No. 16. Plaintiff replies. See Dkt. No. 19. For the following reasons, plaintiff's motion is granted, the Commissioner's cross-motion for judgment on the pleadings is denied, and the determination of the Commissioner is reversed and remanded for further proceedings.

## I. Background

On October 5, 2018, plaintiff filed a Title II application for disability insurance benefits. See T. at 110, 189-90.[3] Plaintiff alleged a disability onset date of June 23, 2018. See id. at 16, 110. The Social Security Administration ("SSA") denied plaintiff's claim on December 21, 2018. See id. at 111. Plaintiff requested a hearing, see id. at 117, and a hearing was held on February 10, 2020, before Administrative Law Judge ("ALJ") Kenneth Theurer. See id. at 55-82. On February 19, 2020, the ALJ issued an unfavorable decision. See id. at 16-28. The Appeals Council denied plaintiff's request for review on November 9, 2020. See id. at 1-6. Plaintiff timely commenced this action on January 12, 2021. See Compl.

## II. Legal Standards

---

[3] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. See Dkt. No. 10. Citations to the administrative transcript refer to the pagination in the bottom, right-hand corner of the page, not the pagination generated by CM/ECF.

**A. Standard of Review**

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1388(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied or it was not supported by substantial evidence. See Johnson v. Bowen, 817 F.2d 983, 985-86 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). The substantial evidence standard is "a very deferential standard of review . . . . [This] means once an ALJ finds facts, we can reject [them] only if a reasonable factfinder would have to conclude otherwise." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (internal quotations marks, citation, and emphasis omitted). Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion is arguably supported by substantial evidence. See Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson, 817 F.2d at 986). However, if the correct legal standards were applied and the ALJ's finding is supported by substantial evidence, such finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's

independent analysis of the evidence may differ from the [Commissioner's]." <u>Rosado v. Sullivan</u>, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

## B. Determination of Disability

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ." 42 U.S.C. § 423(a)(1)(E).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" <u>Id.</u> § 423(d)(1)(A).  A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  <u>See id.</u> § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." <u>Id.</u> § 423(d)(3).  Additionally, the severity of the impairment is "based on objective medical facts, diagnoses[,] or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." <u>Ventura v. Barnhart</u>, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which

significantly limits his [or her] physical or mental ability to do basic work activities.

If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.

Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added).  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further."  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  See DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. (citing Berry, 675 F.2d at 467).

### III. The ALJ's Decision

Applying the five-step disability sequential evaluation, the ALJ first determined that plaintiff had not engaged in substantial gainful activity since June 23, 2018, the

alleged onset date.  See T. at 18.  At step two, the ALJ found that plaintiff had the following severe impairments: "fibromyalgia, degenerative disc disease of the lumbar spine, gastroesophageal reflux disease, hypertension, hernia, irritable bowel syndrome, anxiety, depression, and post traumatic stress disorder [.]"  Id.  At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See id. at 19.  Before reaching step four, the ALJ concluded that plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) except

> the claimant can occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, sit for up to six hours, stand or walk for approximately six hours in an eight hour day with normal breaks; the claimant can occasionally climb ramps or stairs; the claimant can never climb ladders, ropes or scaffolds; the claimant can perform occasional balancing, stooping, kneeling, crouching, and crawling; the claimant can perform no more than frequent reaching, grasping or fine manipulation bilaterally; the claimant can understand and follow simple instructions and directions, perform simple tasks with or without supervision, can maintain attention/concentration for simple tasks, regularly attend to a routine and maintain a schedule; the claimant is able to relate to and interact appropriately with others, coworkers, supervisors and the public, to the extent necessary to carry out simple tasks; the claimant is able to perform limited work that involves simple, routine, and repetitive tasks in a work environment free of fast paced production requirements; the claimant is able to perform work activity involving only simple, work-related decisions, with few, if any, work place changes; the claimant is able to have no more than occasional contact with coworkers, supervisors, and the public.

Id. at 21.  At step four, the ALJ determined that plaintiff was unable to perform past relevant work.  See id. at 26.  At step five, considering plaintiff's age, education, work experience, and RFC, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that plaintiff could perform.  See id. at 26-27.  Thus,

the ALJ determined that plaintiff had "not been under a disability, as defined in the Social Security Act, from June 23, 2018, through the date of th[e] decision[.]"  Id. at 27.

### IV. Discussion[4]

Plaintiff argues that the ALJ did not properly evaluate the medical opinions of record or plaintiff's subjective complaints.  See Dkt. No. 15 at 19-33; Dkt. No. 19.  The Commissioner contends that the ALJ's decision was "legally sound and based on substantial evidence[.]"  Dkt. No. 16 at 6.

### A.  ALJ's Consideration of Medical Opinions

### 1.  Legal Standard

The Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on their supportability and consistency, the author's relationship with the claimant and specialization, and "other factors."  20 C.F.R. § 404.1520c(c). Although the ALJ is not required to assign a specific "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions."  Id. § 404.1520c(a) and (b)(1). The ALJ must expressly "explain how [he or she] considered the supportability and consistency factors" for all of the medical opinions in the record.  Id. § 404.1520c(b)(2). "[S]upportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the

---

4 The Court's citations to the parties' briefs refer to the pagination generated by CM/ECF in the pages' headers.

medical opinions or prior administrative medical finding(s) will be." Id. § 404.1520c(c)(1). "[C]onsistency" means that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. § 404.1520c(c)(2). "If the ALJ fails adequately to explain the supportability and consistency factors, or bases [his or] her explanation upon a misreading of the record, remand is required." Rivera v. Comm'r of the Soc. Sec. Admin., No. 19-CV-4630 (LJL/BCM), 2020 WL 8167136, at *14 (S.D.N.Y. Dec. 30, 2020), report and recommendation adopted, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021) (citation and quotation marks omitted). The ALJ is generally "not required to, explain how [he or she] considered the" remaining factors. 20 C.F.R. § 404.1520c(b)(2). However, if the ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," he or she must "articulate how [he or she] considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions . . . ." Id. § 404.1520c(b)(3).

## 2. Plaintiff's Physical Limitations

### a. ALJ Decision

In determining plaintiff's RFC, the ALJ concluded that plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." T. at 21-22. The ALJ reviewed plaintiff's

subjective complaints that he was "unable to work due to fibromyalgia, polyarthritis, liver lesion, neuropathy, sleep apnea, esophageal spasms, chronic abdominal pain, irritable bowel syndrome, and degenerative disc disease of the lumbar spine." Id. at 21 (citing T. at 217). The ALJ explained that plaintiff "reported problems lifting, standing, walking, sitting, climbing stairs, kneeling, squatting, reaching, and using his hands" and problems paying attention, finishing what he starts, following written instructions, getting along with family [and] friends, and remembering things." Id. (citing T. at 240, 242).

The ALJ recounted the "diagnostic study results" from the record, stating that plaintiff's "lumbar spine indicated there was left-sided disc bulging at L5-S1 with minimal impression on the nerve"; his "cervical spine indicated there was mild disc degeneration at C4-5 and C5-6, with no central canal or foraminal stenosis"; [a]nother imaging result of [his] cervical spine presented with: small right C5-6 herniation[,] diffuse T1 marrow signal, and] multilevel degenerative disc disease"; and his "thoracic spine presented with: no thoracic fracture or malalignment[,] overall very mild chronic thoracic spondylosis, although overall preserved intervertebral disc heights." T. at 22 (citing T. at 314, 323, 335, 1489). The ALJ concluded that "[t]hese imaging results suggest that [plaintiff] has the physical functioning ability to perform work activity at the light exertional level." Id.

The ALJ next reviewed the physical consultative examination findings. See T. at 22. During the examination, plaintiff's gait and stance were normal, he could not walk on his toes and heels or squat, he did not use an assistive device, and he did not need help getting on and off the exam table. See id. at 1428. Plaintiff had a full range of motion in his cervical spine, some range of motion limitations in his lumbar spine, and

full range of motion in his shoulders, elbows, forearms, wrists, hips, knees, and ankles. See id. at 1429. Plaintiff had "[z]ero tender points 0 control." Id. As the ALJ reiterated, plaintiff had full strength in his upper and lower extremities, "his hand strength and dexterity were intact, and his grip strength was full at 5/5 bilaterally." Id. at 22, 1429. The ALJ stated that "[t]hese findings suggest that [plaintiff] has the physical functioning ability to perform the exertional, postural, and manipulative actions required for work activity at the light exertional level." Id. at 22.

The ALJ also reviewed "[t]he recent clinical examination findings[.]" T. at 22. The ALJ explained that "[i]n February 2018, [plaintiff] presented with: full range of motion and strength in the bilateral lower extremity; normal sensation in the bilateral lower extremity; restricted and painful range of motion in the lumbar spine flexion; painless and unrestricted range of motion in the lumbar extension." Id. (citing T. at 916). Next, "[i]n April 2019, [plaintiff] presented with: full range of motion and strength in the bilateral lower extremity; normal sensation in the bilateral lower extremity; restricted and painful range of motion in the lumbar spine." Id. (citing T. at 1504). The ALJ concluded that "[t]hese findings suggest that [plaintiff] has the physical functioning ability to perform the exertional, postural, and manipulative actions required for work activity at the light exertional level." Id.

The ALJ stated that plaintiff's "hypertension is noted in the record as stable and benign. [Plaintiff's] fibromyalgia is noted as well controlled with his medication. [Plaintiff] reported that the prescribed medication helps with his fibromyalgia pain." T. at 22-23 (citing T. at 945, 1005, 1045, 1056; 1120, 1250). Thus, the ALJ concluded that "[t]he record suggest[s] that [plaintiff's] hypertension and fibromyalgia are well

10

controlled, and do not limit him from performing work activity at the light exertional level."  Id. at 23.

The ALJ also considered the records related to plaintiff's gastroesophageal reflux disease and irritable bowel syndrome.  See T. at 23.  The ALJ stated that "[i]n March 2018, the diagnostic study result indicated that the claimant had colonic diverticulitis [Plaintiff] underwent a LINX procedure in June 2018, and he had it removed in July 2018."  Id. (citing T. at 344, 443).  The ALJ noted that plaintiff "reported that his esophageal spasms improved since the reversal of the LINX procedure.  In September 2018, [plaintiff] reported that he has been able to control the vomiting caused by abdominal spasms by adjusting his diet."  Id. (citing T. at 344, 1120).  Thus, the ALJ concluded that "[t]he record suggest[s] that [plaintiff's] gastroesophageal reflux disease and irritable bowel syndrome is well maintained, and does not limit the claimant from performing work activity at the light exertional level."  Id.

The ALJ listed plaintiff's activities of daily living as being "able to prepare food, drive, go out alone, shop, provide pet care, pay bills, count change, manage money, follow written and verbal instructions, provide childcare, bathe, and dress himself."  T. at 23 (citing T. at 237-39, 1422-33).

The ALJ then restated the state agency consultants' determinations.  See T. at 24.  State Agency consultant R. Reynolds determined that plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and frequently climb ramps, stairs, ropes, ladders, and scaffolds, stoop, kneel, crouch, and crawl.  See id. at 102.  The ALJ stated that "Dr. Reynolds' opinion is persuasive and consistent with the overall medical evidence.  Dr. Reynolds' opinion is supported with an explanation based on the

medical evidence record." Id. at 24.  The ALJ further noted that "Dr. Reynolds has

knowledge of the agency's program and its evidentiary policies, and Dr. Reynolds had

the opportunity to review the overall medical evidence.  As noted above, [plaintiff's]

activities of daily living suggest that he is able to perform work activity at the light

exertional level." Id.

Kalyani Ganesh, M.D., conducted plaintiff's physical consultative examination.

See id. at 1427-33.  Dr. Ganesh determined that plaintiff had no gross physical

limitations sitting, standing, and walking and moderate limitations lifting, carrying,

pushing, and pulling.  See id. at 1430.  The ALJ stated that "Dr. Ganesh's opinion is

persuasive and consistent with the record.  Dr. Ganesh's opinion is supported with an

explanation based on the examination findings, and Dr. Ganesh has knowledge of the

agency's program and its evidentiary policies." Id. at 24.  Further, the ALJ noted that

"Dr. Ganesh's opinion is consistent with the objective findings in the record, and

[plaintiff's] reported activities of daily living, which suggest that he is able to perform light

exertion work activity." Id.

The ALJ noted that plaintiff's treating provider L. McIlvain, M.D., determined that

plaintiff could "occasionally lift and carry 20 pounds, and sit, stand, and walk for 1 hour

in an 8 hour day . . . occasionally grasp, turn, twist objects, use his hands and fingers

for fine manipulations, and use his arms for reaching in an 8 hour day."  T. at 25.  The

ALJ found the opinion to be "less persuasive, as it is inconsistent with the clinical

findings and examination results.  For example, during an examination, there were: no

clinical signs indicating synovitis; signs that [plaintiff's] gait was normal." Id. (citing T. at

1572).  The ALJ explained that "[t]here was no tenderness, swelling, effusion, or range

of motion limitation noted during the examination.  During other examinations in December 2018 and September 2019, there was no peripheral joint synovitis noted." Id. (citing T. at 1568, 1575).

Plaintiff's treating provider Jacqueline Barkley, PA, determined that plaintiff was able to occasionally lift and carry five-to-ten pounds, frequently able to lift and carry up to five pounds, must change positions every ten-to-fifteen minutes for up to ten-to-fifteen minutes, he is able to stand and walk for less than one hour, and sit for one hour.  See T. at 1455.  Ms. Barkley also concluded that plaintiff was able to frequently grasp, turn, and twist objects, use his hands and fingers to perform fine manipulations, and occasionally use his arms for reaching.  See id.  at 1456.  Ms. Barkley noted that plaintiff would be absent for more than three days per month, and his symptoms would interfere with "his ability to maintain [indiscernible] focus and concentration."  Id.  at 1457.  The ALJ stated that "Ms. Barkley's opinion is less persuasive and not consistent with the objective evidence.  For example, in a November 2019 examination, [plaintiff] was oriented to person, place, and time.  [Plaintiff] had normal range of motion, and his reflexes were normal.  [Plaintiff's] behavior, judgment, and thought content were normal."  Id. at 25 (citing T. at 1661).  The ALJ stated that "[t]hese findings were consistent with other examinations"  Id.[5]

Finally, the ALJ explained that plaintiff's treating provider, Atul Maini, M.D., "noted that [plaintiff] requested more and more disability, but [Dr. Maini] could not provide him with such, as it was explained to [plaintiff] that he does not [have] a

---

[5] To support this contention, the ALJ cites "Exhibit 24F, p. 15, p. 44[.]"  T. at 25.  However, there is no page fifteen or forty-four in "Exhibit 24F."  See id. at 1467-75.

surgically fixable problem.  [Dr. Maini] learned that [plaintiff] later complained to the hospital that [Dr. Maini] was not providing him disability."  T. at 26 (citing T. at 1124).

### b.  Analysis

Plaintiff contends that the ALJ erred by failing to analyze the supportability of PA McIlvain's opinion.  See Dkt. No. 15 at 20-21.  Specifically, plaintiff argues that the ALJ ignored that PA McIlvain's opinion was "based on evidence of fibromyalgia with widespread pain in all quadrants of the body for at least three months and 18 positive tender points along with symptoms of difficulty thinking, fatigue, insomnia, depression, nervousness, and loss of appetite."  Id. at 20-21 (citing T. at 1441).  Plaintiff also contends that the ALJ erred in considering the consistency factor related to PA McIlvain and PA Barkley's opinions because the ALJ relied only on examinations that showed normal ranges of motion and reflexes and no synovitis or effusion which is a "fundamental misunderstanding of . . . fibromyalgia."  Id. at 21 (citing T. at 25).  Rather, the ALJ relied on the Dr. Ganesh's consultative examination and Dr. Reynolds's consulting determination which plaintiff contends is improper because Dr. Ganesh's opinion was a one-time snapshot of plaintiff's limitations and his opinion was "vague[,]" and Dr. Reynolds did not review a complete record.  See id. at 23-24.

The Commissioner acknowledges that the ALJ "need address only the two most important factors—supportability and consistency" and states that "ALJ Theurer was free to discount Ms. McIlvain's opinions for lack of competent clinical support and inconsistency with other evidence[.]"  Dkt. No. 16 at 21, 25.  The Commissioner does not address whether the ALJ appropriately considered PA Barkley's opinion.  See id. at 21-34.  The Commissioner also asserts that the ALJ appropriately relied on Dr.

Ganesh's "mild" and "moderate" limitation findings which were not impermissibly vague, and that the ALJ "independently reviewed the clinical findings post-dating" Dr. Reynolds' assessment. Id. at 25-27.

It is evident that the ALJ did not appropriately address the supportability of either PA McIlvain's or PA Barkley's opinions but only addresses their consistency "with the objective evidence," "clinical finings and examination results." T. at 25. The ALJ is required to discuss the supportability of every medical opinion in the record. See 20 C.F.R. § 404.1520c(b)(2). The failure to do so amounts to legal error. See M.-M., v. Kijakazi, No. 5:21-CV-14, 2022 WL 1223202, at *7 (D. Vt. Apr. 26, 2022) (quoting Brianne S. v. Comm'r of Soc. Sec., No. 19-CV-1718 (FPG), 2021 WL 856909, at *5 (W.D.N.Y. Mar. 8, 2021)) ("An ALJ's failure to 'examine what [the doctors] used to support their opinions and reach their ultimate conclusions' is legal error."). To be sure, the ALJ cited to two treatment records wherein plaintiff saw PA McIlvain and one treatment record from PA Barkley. See T. at 25, 1568, 1575, 1661. However, despite the ALJ citing the treatment records and them showing "no peripheral joint synovitis[,]" PA McIlvain documented "18 out of 18 total tender points"—directly supporting PA McIlvain's handwritten notation on the medical opinion that plaintiff's pain is reflected in "18 tender points." Id. at 25, 1441, 1568 1575. The ALJ did not discuss this apparent support between the treatment notes and medical opinion. See id. at 25.

Further, the supportability factor requires consideration of "the objective medical evidence and supporting explanations presented by" an opinion's author. 20 C.F.R. § 404.1520c(c)(1) (emphasis added). PA McIlvain and PA Barkley provided supporting explanations. See T. at 1440-41, 1453-57. PA McIlvain explained the various check

marks on the opinion by writing that plaintiff's "increased anxiety exacerbates sleep disruption which increase soft tissue pain," and that her widespread pain is caused by "18 tender points."  Id. at 1440-41.  PA Barkley wrote even-more thorough supporting explanations stating that plaintiff's diagnoses are "Fibromyalgia, chronic GERD & esophageal spasm, colitis, polyarthritis & positive ANA, anxiety, depression, PTSD, IBS, hypertension, chronic back pain, sleep apnea."  Id. at 1453.  She also explained that plaintiff's symptoms include "chronic pain in the abdomen, upper and lower back, polyarthralgia, frequent diarrhea and abdomen, episodic major depressive episodes and panic disorder ongoing with generalized anxiety."  Id. at 1454.  PA Barkley stated that the nature of plaintiff's pain is "[b]elieved to be largely neuropathic 2 [degree] Fibromyalgia and degenerative changes, chronic esophageal spasm/chest pain, vomit and a[bdominal] pain."  Id.  The location of the pain is his back, abdomen, and chest and is it "[d]aily and chronic."  Id.  As for factors that precipitate or aggravate plaintiff's pain, PA Barkley listed, "[e]ating, increased anxiety symptoms tend to [increase] abdominal symptoms, excessive lifting, sitting and standing increase neck and back pain."  Id.  PA Barkley circled "yes" when asked whether plaintiff's "symptoms [will] likely increase if she/he were placed in a competitive work environment" and wrote, "[p]ain in joints and back will increase [] activity anxiety and panic will often set in which can impact cognitive function and ability to perform in a competitive work environment."  Id. at 1456.  She explained that plaintiff's "physical pain often triggers anxiety and vice versa.  Patient PTSD symptoms greatly [impact] his ability to maintain [indiscernible] focus and concentration."  Id. at 1457.  Finally, Ms. Barkley wrote that plaintiff "continues to struggle daily with symptoms of his various complex medical issues.  This

continued despite several years of continues treatment from a multidisciplinary approach." Id. The ALJ's failure to consider these supporting explanations and the support between the treatment notes and opinions is legal error requiring remand. See Nicole L. v. Kijakazi, No. 6:20-CV-01576 (NAM), 2022 WL 160274, at *8 (N.D.N.Y. Jan. 18, 2022) (finding error where the ALJ "did not provide any explicit analysis of [an opinion's] supportability[]" and "without some clear discussion of the supportability factor the Court is left to guess at the ALJ's reasoning, which frustrates meaningful review.").

As to consistency, plaintiff contends that the ALJ erred by concluding that the opinions were not consistent with the record where there are treatment records documenting "widespread pain with positive tender points," "difficulty thinking/concentrating," fatigue, insomnia, and loss of appetite. Dkt. No. 15 at 21 (citing T. at 462, 925, 1057-58, 1468, 1470, 1472, 1574, 1805-06, 1816, 1832,1851, 1858, 1877, 1890-92). Further, plaintiff asserts that the ALJ's rejection of the opinions because "'examinations do not document synovitis, effusion, or range of motion limitation' and "normal reflexes' evidences a fundamental misunderstanding of [plaintiff's] disability due to fibromyalgia." Id. In response, the Commissioner identifies "multiple records where [p]laintiff had few or no fibromyalgia tender points nor tenderness elsewhere[,]" and where "[h]e was routinely in little or no distress upon examination even when he was allegedly in the throes of 8/10 to 10/10 pain." Dkt. No. 16 at 22 (citing T. at 773, 906, 911, 916, 922, 947, 956, 977, 982-83, 991, 1058, 1428-29, 1464-65, 1495, 1504, 1509, 1701, 1710, 1719, 1727, 1743, 1758, 1770, 1776).

The extent of the ALJ's discussion of record evidence concerning plaintiff's fibromyalgia are his notations that (1) the consultative examiner found "no tender points,

0 control[,]" (2) plaintiff's "fibromyalgia is noted as well controlled with his medication[,]" and (3) he "reported that the prescribed medication helps with his fibromyalgia pain." T. at 22-23 (citing T. at 945, 1056, 1120, 1429).[6] Otherwise, the ALJ relies on the absence of any "peripheral joint synovitis" in a December 2019 and September 2019 examination and plaintiff's "normal ranges of motion" and normal reflexes. Id. at 25 (citing T. at 1568, 1572, 1575, and 1662). In considering the "clinical examination findings[,]" the ALJ referenced two treatment notes from February 2018 and April 2019 wherein plaintiff had full ranges of motion in his extremities but a restricted and painful range of motion in his lumbar spine. Id. at 22 (citing T. at 916, 1504).

Numerous records that the ALJ cited and the Commissioner now relies on, reflect that plaintiff had a normal gait and stance, but his range of movement of the spine was restricted and painful, joint and muscle pain were noted, he was sometimes in mild distress, other times he was not in acute distress but had tenderness on palpation of paraspinal and trigger points of the rhomboid muscles and paraspinal muscle, he had "positive" signs for arthralgias, he was "positive" for back and neck pain but had a normal range of motion with tenderness and pain on exam, he had "positive" signs for myalgias, and he had "18/18" tender points on examination. T. at 911, 1464-65, 1495, 1504, 1509, 1568, 1575, 1701, 1710, 1719. A few of the records cited by the ALJ indicate that that "best way to manage his fibromyalgia is by managing his underlying anxiety and depression[,]" that his "Fibromyalgia appears to be the major issue[,]" and that he had "18 out of 18 total tender points." Id. at 1568-69, 1572, 1575-76. The records plaintiff identifies also reflect that at various times plaintiff had "18/18" tender

---

[6] Two of the four records that the ALJ cites are identical records from the same treatment session. See T. at 1056, 1120.

points, tenderness of his cervical and thoracic spine, he had generalized morning stiffness, all day fatigue, changes in his appetite and sleep disturbance.  See id. at 925, 1057-58, 1468, 1472, 1574, 1816, 1832, 1851, 1858, 1877, 1890-92.

In support of the contention that the ALJ did not err in relying on the lack of objective findings relating to plaintiff's fibromyalgia, the Commissioner cites LaVonda S. v. Kijakazi.  See Dkt. No. 16 at 24.  In Lavonda, Magistrate Judge Peebles aptly explained that "fibromyalgia is by definition and by its very nature an elusive impairment that doesn't always present itself with objective evidence.  There are ways to diagnosis it . . . but there is a distinction . . . between requiring objective evidence to support the diagnosis versus objective evidence to gauge the resulting limitations."  No. 3:20-CV-0483 (DEP), 2021 WL 3884255, at *4 (N.D.N.Y. Aug. 31, 2021).  In that case, the Court determined that the ALJ did not err in relying on "the available objective evidence to evaluate the effect of [the] plaintiff's fibromyalgia on her ability to perform such functions as walking, bending, reaching, lifting" such as the "plaintiff's extensive walking activities, tax preparation, missionary trip to Poland, the fact that she went to college full time and worked part time at the same time, her extensive activities of daily living, and properly drew inferences from those objective factors to come up with the residual functional capacity finding."  Id. at *5.  The Court also noted that the ALJ "properly relied on the opinion, the medical source opinion of [the] consultative examiner . . ., who noted mild restrictions in lifting, . . . something that is totally consistent with light work."  Id.

The Court agrees that the ALJ's reliance on the lack of objective findings such as range of motion limitations, signs of synovitis, swelling, etc., is not per se error—the ALJ can and should rely on such findings, or a lack thereof, in determining the severity and

limiting effects of plaintiff's fibromyalgia.  See Dkt. No. 16 at 23-25; see LaVonda S., 2021 WL 3884255 at *4-5.  The ALJ found that plaintiff's fibromyalgia was a severe impairment and that during his examinations he sometimes had a limited range of motion and pain in the lumbar spine.  See T. at 11, 22.  However, there is little else in the ALJ's decision that "demonstrates that []he fully '[ ]understood the . . . nature of [fibromyalgia].'"  Lisa E. v. Comm'r of Soc. Sec., No. 20-CV-0037 (MWP), 2021 WL 4472469, at *6 (W.D.N.Y. Sept. 30, 2021) (citation omitted).  The ALJ did not acknowledge in any way the numerous records across plaintiff's treatment history documenting "18/18 tender points," tenderness upon palpation, and limited ranges of movements, which were all noted in the objective examination portions of the relevant records.  T. at 911, 1464-65, 1468, 1472, 1495, 1504, 1509, 1568, 154-75, 1701, 1710, 1719.  The ALJ did not address the supportability of either PA McIlvain's or PA Barkley's opinions, both of whom referenced plaintiff's tender points, pain, sleep disturbance, and other limitations stemming from, in part, plaintiff's fibromyalgia.  See id. at 25, 1440-41, 1443-47.  Further, the ALJ did not discuss the consistency of those opinions with these records documenting the tender points, pain, and tenderness range of motions limitations.  See id. at 25.  Rather, the ALJ relied on only the examinations showing no tenderness, synovitis, and normal ranges of motion and reflexes.  See id.  It was legal error for the ALJ to not consider the supportability of the opinions and the consistency conclusions cannot be based on substantial evidence where the ALJ did not address the plethora of records showing tenderness, range of motion limitations, and pain.[7]  See Ian S. v. Comm'r of Soc. Sec., No. 20-CV-6022-A, 2021 WL 3292203,

---

[7] To the extent plaintiff argues that the ALJ erred in not considering PA McIlvain's treating relationship or specialization, the ALJ was not obligated to articulate consideration of those factors as he did not find the

at *4 (W.D.N.Y. Aug. 2, 2021) (citation and quotation marks omitted) ("Any mixed results from [the p]laintiff's physical examinations are consistent with fibromyalgia; as [f]or a person with [fibromyalgia], the Commissioner is to consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.").

To the extent the Commissioner identifies records that demonstrate no tender points, tenderness, or "little to no distress[,]" the Court acknowledges that it is the ALJ's duty to resolve conflicts in the record.  See William S. v. Comm'r of Soc. Sec., No. 1:20-CV-544 (JLS), 2022 WL 1241698, at *3 (W.D.N.Y. Apr. 27, 2022) ("Where there is conflicting evidence in the record, it is within the discretion of the ALJ to consider such contradictions.").  However, there is insufficient consideration of the records demonstrating signs and symptoms of fibromyalgia to support the ALJ's conclusion that PA Barkley's and PA McIlvain's opinions are inconsistent with the objective evidence. See T. at 25; Compare Rachael V. v. Comm'r of Soc. Sec., No. 3:18-CV-1346 (TWD), 2020 WL 1304076, at *7 (N.D.N.Y. Mar. 19, 2020) ("[T]he ALJ found [the p]laintiff's fibromyalgia severe and noted her reports that 'her entire body hurts all of the time from head to toe.' . . .  In considering [the consultative examiner's] opinion, the ALJ noted her observation of 14 positive tender points. . . .  Although the ALJ did not further explicitly discuss [the p]laintiff's fibromyalgia and related pain, his overall decision indicates he gave it sufficient consideration . . . ."); with Acosta Cuevas v. Comm'r of Soc. Sec., No.

---

opinion equally persuasive with one or more other opinions.  See Dkt. No. 15 at 23; see also 20 C.F.R. 404.1520(b)(3).  However, the Court notes that "[t]he new regulations cannot be read as a blank check giving ALJs permission to rely solely on agency consultants while dismissing treating physicians in a conclusory manner.  On the contrary, many district courts in the Second Circuit, when presented with these regulations, have concluded that the factors are very similar to the analysis under the old rule." Dany Z. v. Saul, 531 F. Supp. 3d 871, 885 (D. Vt. 2021) (collecting cases).

20-CV-0502 (AJN/KHP), 2021 WL 363682, at *15 (S.D.N.Y. Jan. 29, 2021) (citations omitted) ("While an ALJ is entitled to reconcile conflicting evidence in the record, and need not address every last piece of medical evidence, the ALJ must provide a reviewing Court with a sufficient explanation to ensure that they have complied with the legal procedures controlling their decision and cannot ignore or mischaracterize evidence.  These principles apply equally to the ALJ's mandatory explanation of the new consistency factor."), report and recommendation adopted, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022).  As the ALJ did not address the supportability of plaintiff's providers' opinions and the consistency analysis was deficient, remand is warranted.[8]

See Cassandra A. v. Kijakazi, No. 3:21-CV-007 (ATB), 2022 WL 1597680, at *8 (N.D.N.Y. May 19, 2022) ("[T]he ALJ's evaluation of the majority of the opinion evidence of record failed to sufficiently consider the supportability and consistency factors.  For example, in rejecting the opinion of each treating provider as inconsistent with the record, the ALJ cited to limited, cherry-picked treatment notes indicating [the] plaintiff's normal examination findings, and ignored those portions of the record that addressed [the] plaintiff's limitations.").

---

[8] Plaintiff does not challenge the ALJ's step-three determination.  See Dkt. No. 15.  However, the ALJ's lack of consideration for the nature of fibromyalgia is also evidenced by the ALJ's failure to reference SSR 12-2p and discuss whether plaintiff met any relevant listings.  See T. at 19-20; see also Anysha M. v. Comm'r of Soc. Sec., No. 3:19-CV-0271 (CFH), 2020 WL 1955326, at *4 (N.D.N.Y. Apr. 23, 2020) ("SSR 12-2p explains that fibromyalgia cannot meet a listing because it is not a listed impairment, but the Agency determines whether fibromyalgia medically equals a listing or medically equals a listing in combination with at least one other medically-determinable impairment at Step Three and references Listing 14.09D for inflammatory arthritis as an example. . . .  [T]he ALJ noted that she specifically considered Listings 14.09 for inflammatory arthritis and 14.00 for impairments of the immune system when assessing whether [the p]laintiff had an impairment or combination of impairments which met or medically equaled a listed impairment. . . .  The ALJ's detailed explanation of her consideration of the Listings indicates that she properly considered [the p]laintiff's fibromyalgia and other severe impairments at this step in the sequential evaluation.").

### 3. Plaintiff's Mental Limitations

### a. ALJ Decision

As to plaintiff's mental impairments, in determining that plaintiff's subjective complaints were inconsistent with the record, the ALJ stated that "[t]he record does not suggest that [plaintiff's] mental impairments limit him from performing unskilled work activity.  At times, [plaintiff's] treating providers noted [plaintiff's] mood and affect were normal and appropriate.  At times, [plaintiff's] insight was normal without delusions or hallucinations, and the claimant denied suicidal or homicidal ideation."  T. at 23 (citing T. at 359, 440, 448, 470, 487, 906, 911, 917; 956; 965, 1058, 1075, 1424, 1495, 1500, 1509, 1798, 1806, 1817, 1825, 1833, 1845, 1859, 1870, 1877, 1883, 1890).

The ALJ reviewed the psychiatric consultative examination findings.  See T. at 23.  During the examination, plaintiff's recent and remote memory were intact, he was able to recall three objects immediately and three objects after five minutes and to restate five digits forward and four digits backward, his demeanor and responsiveness to questions was cooperative, and his manner of relating, social skills, and overall presentation were adequate.  See id. at 1424-25.  Further, plaintiff's "speech intelligibility was fluent," voice was clear, expressive and receptive language were adequate, attention and concentration were intact, and he was able to count, perform simple calculations, and complete "serial 7s from 100."  Id. at 1424-25.  Plaintiff's insight and judgment were fair, he was appropriately dressed, his grooming was good, and "[h]is affect was of full range and congruent with [his] thought and speech.  Id. at 1424-25.  The ALJ stated that "[t]he consultative examination findings suggest that [plaintiff] is able to perform unskilled work activity."  Id. at 23.

State agency consultant M. Tatar, Ph.D., conducted plaintiff's initial disability determination related to his mental limitations.  See T. at 104-105.  Dr. Tatar determined that plaintiff had mild limitations in his ability to understand, remember, or apply information; and moderate limitations in his ability to interact with others, concentrate, persist, or maintain pace, adapt or manage oneself.  See id. at 99.  Dr. Tatar explained that plaintiff was "able to understand and remember instructions and work procedures"; "has some difficulty sustaining adequate attention and concentration to complete work-like procedures but is able to sustain a routine and perform semi-skilled work"; was "able to relate and respond in an appropriate manner"; and "exhibits some difficulty in coping with stress, but shows adequate ability to adapt to changes and deal with the mental demands of a work setting."  Id. at 105.  The ALJ stated that "Dr. Tatar's opinion is persuasive and consistent with the record.  Dr. Tatar had the opportunity to review the medical evidence record, and Dr. Tatar's opinion is supported with an explanation."  Id. at 24.  The ALJ also noted that "Dr. Tatar has knowledge of the agency's program and its evidentiary policies.  [Plaintiff's] reported activities of daily living, as noted above, suggest that [he] is able to perform unskilled work activity."  Id.

Jeanne Shapiro, Ph.D., conducted plaintiff's psychiatric consultative examination. See T. at 1422-26.  Dr. Shapiro concluded that plaintiff had (1) no limitations understanding, remembering, or applying simple directions and instructions; maintaining personal hygiene and wearing appropriate attire; being aware of normal hazards and taking appropriate precautions or using reasoning and judgment to make work-related decisions; (2) mild to moderate limitations understanding, remembering, or "applying complex directions and instructions given that he complains of memory deficits and

24

confusions"; interacting adequately with supervisors, coworkers, and the public; sustaining concentration and performing a task at a consistent pace; and sustaining an ordinary routine and regular attendance at work; and (3) moderate-marked limitations regulating emotions, controlling behavior, and maintaining well-being.  See id. at 1425-26.  The ALJ concluded that "Dr. Shapiro's opinion is generally persuasive and consistent with the record.  Dr. Shapiro has knowledge of the agency's program and its evidentiary policies, and Dr. Shapiro had an opportunity to examine" plaintiff.  Id. at 25.  The ALJ "disagree[d] with Dr. Shapiro's finding on [plaintiff's] ability to regulate emotions and control his behavior.  This adjustment is based on and supported by [plaintiff's] ability to socialize, his reported activities of daily living, and based on his social worker's explanation."  Id.

The ALJ then reviewed Katie McBeth, LCSW's opinion wherein, according to the ALJ, she determined that "it would be detrimental to [plaintiff] if he continued to avoid occupational and social activities, and it would interfere with his recovery."  T. at 25 (citing T. at 1899-1900).  The ALJ noted that "Ms. McBeth opined that [plaintiff's] mental health condition does not limit him in any way from performing basic occupational duties, and he has been encouraged to increase both his social and occupational opportunities."  Id. at 25, 1899.  The ALJ then concluded that "Ms. McBeth's opinion is persuasive and consistent with the record.  Ms. McBeth has a treating relationship with [plaintiff], and Ms. McBeth's opinion is consistent with the objective medical evidence, and [plaintiff's] activities of daily living, which suggest that he is able to perform unskilled work activity."  Id.

25

Finally, the ALJ reviewed the opinion of plaintiff's treating provider Samantha Shue, NP.  See T. at 25-26.  Ms. Shue determined that plaintiff had marked limitations in his ability to understand and remember, concentrate and persist, interact with others, and adapt and manage himself.  See T. at 1450.  Ms. Shue also noted that plaintiff would be absent more than three days per month.  See id. at 1451.  The ALJ stated that "Ms. Shue's opinion is not persuasive and not consistent with the record, which contains numerous examination findings that are within normal limits.  Ms. Shue's opinion conflicts with the opinions of [plaintiff's] other treating providers, including the opinion of [plaintiff's] treating social worker, Ms. McBeth."  Id. (citing T. at 1899-1900).

### b.  Analysis

Plaintiff contends that the ALJ erred in evaluating the medical opinions related to his mental health.  See Dkt. No. 15 at 25.  Plaintiff asserts that the ALJ failed to address the supportability factor and "consider the explanations provided by N.P. Shue in support of her opinions."  Id.  Plaintiff contends that the ALJ erred as to the consistency factor where there are records supporting NP Shue's opinion that the ALJ did not address.  See id. at 27-28 (citing T. at 925, 1470, 1797, 1618, 18-5-06, 1808-09, 1819-20, 1824, 1832, 1835-36, 1844, 1851, 1858, 1869, 1877, 1890-92, 1899).  Plaintiff also argues that the ALJ erred in discounting NP Shue's opinion as inconsistent with Ms. McBeth's opinion because Ms. McBeth is not an acceptable medical source and gave no functional limitations in her opinion.  See id. at 28.  Plaintiff takes issue with the ALJ's evaluation of the consultative examiner, Dr. Shapiro's opinion, stating that the ALJ erred by discounting parts of the opinion because plaintiff could "engage in some activities of daily living[.]"  Id.  Plaintiff also contends that the parts of the opinion the ALJ accepted

conflict with plaintiff's treating provider as the consultative examination is only a "one-time snapshot" of plaintiff's mental health.  Id. at 30 (citation omitted).  Finally, plaintiff argues that the ALJ erred in relying on the state agency consultant who reviewed the record "before [p]laintiff even began psychiatric treatment."  Id.

The Commissioner argues that the ALJ "sufficiently addressed" the supportability of NP Shue's opinion "when he noted that the record 'contains numerous examination findings that are within normal limits[,]' which undercut Ms. Shue's checkmarks . . . ."  Dkt. No. 16 at 27.  The Commissioner cites to numerous records, including Ms. Shue's treatment records, reflecting that plaintiff was cooperative and alert, had normal attention, concentration, speech, and psychomotor activity, his thought processes were intact, his insight and judgment were fair, and his impulse control was average.  See id. (citing T. at 359, 440, 448, 479, 487, 906, 911, 956, 965, 1058, 1075, 1424-25, 1800-01, 1808-09, 1819-20, 1827-28, 1835-36, 1847-48, 1854-55, 1861-62, 1872-73, 1883-84).  The Commissioner contends that "[p]laintiff misses the mark with his argument that Ms. McBeth's opinion is less persuasive because she is merely a licensed clinical social worker, not an acceptable medical source.  Plaintiff's attorney solicited Ms. McBeth's opinion . . ., so he plainly believed that Ms. McBeth could offer useful insight into [p]laintiff's mental functioning."  Id. at 31.  Further, the Commissioner states that Ms. McBeth included functional limitations where she stated that plaintiff was not limited "in any way from perform[ing] basic occupational duties"—asserting that this meant that plaintiff had no functional limitations.  Id. (citing T. at 1900).  As to the consultative examination, the Commissioner contends that ALJ "properly juxtaposed [p]laintiff's activities requiring self-regulation and socialization . . . against other reports that he had

profound social restrictions."  Id. at 32.  Additionally, the Commissioner asserts that the state agency consultant's opinion "was actually more favorable to [p]laintiff than Ms. McBeth's . . . [and the ALJ] reasonably found that the evidence before and after December 2018 was more consistent" with the consultant's opinion that plaintiff's providers' opinions.  Id. at 27.

First, the ALJ's consideration of "numerous examination findings that are within normal limits" does not "sufficiently address[]" the supportability factor.  Dkt. No. 16 at 27.  Rather, in the ALJ's discussion of NP Shue's opinion, he stated that the opinion was not consistent with "numerous examinations findings that are within normal limits" but did not cite to a single treatment record.  T. at 26.  The only other objective medical evidence cited was Ms. McBeth's opinion.  See id.  Any reference to "evidence from other medical sources and nonmedical sources in the claim" relates to the consistency factor.  20 C.F.R. § 404.1520c(c)(2).  As to the supportability factor, which address "the objective medical evidence and supporting explanations presented by a medical source to support his or her medical opinion[,]" the ALJ's decision was silent.  Id. § 404.1520c(c)(1).  Ms. Shue's opinion noted that plaintiff's diagnosis was "chronic posttraumatic stress disorder" and checked numerous boxes indicating the "signs and symptoms" supporting the diagnosis including, inter alia, difficulty thinking or concentrating, recurrent panic attacks, decreased energy, appetite changes, social withdrawal, and she wrote "issues with insomnia and nightmares."  T. at 1447-48.  She further wrote that plaintiff had "persistent anxiety, instructive thoughts, depressed mood, sleep disturbance/nightmares, irritability."  Id. at 1449.  Ms. Shue explained that plaintiff's "stress and anxiety increase his soft tissue pain" and "stress increases anxiety

and pain levels." Id.  The ALJ did not consider whether these explanations supported Ms. Shue's opinion.  See id. at 25-26.

Similarly, in reviewing Dr. Shapiro's consultative examination, the ALJ found the opinion to be "generally persuasive and consistent with the record. . . .  [The ALJ] disagree[d] with Dr. Shapiro's finding on [plaintiff's] ability to regulate emotions and control his behavior.  This adjustment is based on and supported by [plaintiff's] ability to socialize, his reported activities of daily living, and based on his social worker's explanation."  T. at 25.  The ALJ did not address what Dr. Shapiro used to support her opinion.  See id.  For instance, Dr. Shapiro's examination reflected plaintiff's reports that he "gets depressed and like less of a man because of the stigma around men not working. . . .  [He] currently isolates from others and does not talk to many people.  He states that he is unmotivated and lethargic."  Id. at 1423.  On examination, his "social skills, and overall presentation was adequate" but he "reported feeling anxious and in pain; [plaintiff] was tense and apprehensive."  Id. at 1424.  Plaintiff's insight and judgment were fair, and he explained that he "gets along well with friends but their relationships are strained, and gets along with his family for the most part."  Id. at 1425.  As for his activities of daily living, plaintiff "spends his days doing chores, reading, playing fantasy football, resting, watching TV, playing video and board games with his children and helping them with homework, and listening to music."  Id.  The ALJ did not address whether these findings supported Dr. Shapiro's conclusions.  See id. at 24-25.

The failure to "explain how [he] consider the supportability" factor related to NP Shue's and Dr. Shapiro's opinions is legal error requiring remand.  20 C.F.R. § 404.1520c(b)(2); see also Acosta Cuevas, 2021 WL 363682, at *14 ("Nowhere in the

ALJ's decision does she explain, as the new regulations require, what the respective [consultative examiners] used to support their opinions and reach their ultimate conclusions.  Instead, the ALJ discussed some of the objective medical evidence in the record in comparison to the [consultative examiners'] opinions to determine if the evidence and opinions were consistent, which is what the consistency, not supportability factors, calls for.  Thus, the ALJ failed to apply or even consider the supportability factor.").

Plaintiff asserts that the ALJ also erred in discounting NP Shue's opinion because of Ms. McBeth's contrary opinion.  See Dkt. No. 15 at 28.  "A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions . . . ."  20 C.F.R. § 404.1513(a)(2) (emphasis added).  "Medical source means an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law . . . ."  20 C.F.R. § 404.1502(d).  A social worker is not considered a medical source.  See id. § 404.1502(e)(3) ("Nonmedical source means a source of evidence who is not a medical source.  This includes, but is not limited to . . . [p]ublic and private social welfare agency personnel . . . .");  see also Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5850 (emphasis added) ("[W]e often receive functional evidence from nonmedical sources, such as testimony, evaluations, and reports from parents, teachers, special education coordinators, counselors, early intervention team members, developmental center workers, day care

center workers, <u>social workers</u>, and public and private social welfare agency personnel.").

The ALJ is "not required to articulate how [he or she] considered evidence from nonmedical sources using the requirements in" 20 C.F.R. § 404.1520c(a)-(c).  20 C.F.R. § 404.1520c(d).  However, consideration of the consistency of a medical opinion allows the ALJ to compare the medical opinion to "evidence from other medical sources and <u>nonmedical sources</u> in the claim . . . ."  <u>Id.</u> § 404.1520c(c)(2) (emphasis added).  Therefore, although Ms. McBeth's letter is not a medical opinion, it was not error for the ALJ to consider it when discussing the consistency of NP Shue's opinion.  <u>See</u> T. at 26.  The Court also disagrees with plaintiff's contention that Ms. McBeth did not explain what plaintiff could do despite his limitation; rather, Ms. McBeth stated that "his mental health condition does not limit him in any way from performing basic occupational duties and he has been encouraged to increase both his social and occupational opportunities."  <u>Id.</u> at 1899; <u>see</u> Dkt. No. 15 at 28.  Despite the ALJ not being required to assess Ms. McBeth's letters under the requirements of 20 C.F.R. § 404.1520c(a)-(c), he did so, in part.  <u>See</u> T. at 25.  The ALJ found the "opinion" to be "persuasive and consistent with the record."  <u>Id.</u>  The ALJ's analysis is flawed for numerous reasons.  First, Ms. McBeth's letter is not an "opinion" as she is not a medical source.  20 C.F.R. § 404.1513(a)(2).  Second, the ALJ addressed only half of the "most important factors"— failing to address the supportability of the opinion.  20 C.F.R. § 404.1520c(b)(2).  Third, the ALJ stated that the "opinion" was "consistent with the objective medical evidence" but did not cite to anything in the record.  T. at 25.  Ms. McBeth explained that plaintiff was not limited "in any way" because of his mental health.  <u>Id.</u> at 1900.  However, Dr.

Shapiro, NP Shue, and Dr. Tatar determined that plaintiff was limited by his mental health conditions (albeit to varying degrees).  See id. at 104-05, 1425-26, 1447-51. Even excluding Dr. Shapiro's and NP Shue's opinions as the ALJ did not find them wholly persuasive, the ALJ did not explain how Ms. McBeth's no-limitations opinion is consistent with Dr. Tatar's consultative determination finding some limitations despite finding both opinions to be "persuasive."  See id. at 25.  The ALJ's conclusory sentence that the "opinion" is consistent with the objective medical evidence is insufficient for meaningful judicial review.  Id.; see Jackson v. Kijakazi, No. 20-CV-7476 (JLC), 2022 WL 620046, at *18 (S.D.N.Y. Mar. 3, 2022) (citation omitted) ("It is not sufficient to cite to 'some objective medical evidence in the record' and simply conclude that an opinion is 'consistent with other evidence in the file' rendering it 'persuasive.'").  As the ALJ erred in his review of the mental health opinions of record under the relevant regulations, remand is warranted.[9]

### 4.  Reliance on State Agency Opinions

Plaintiff also argues, as related to both the physical and mental health opinions, that the ALJ erred in relying on the state agency consultants' opinions as they were

---

[9] As with the physical-limitations opinions, plaintiff challenges the ALJ's failure "to consider N.P. Shue's extensive treatment relationship with" plaintiff. Dkt. No. 15 at 31.  As explained in footnote number 7, the ALJ is not required to articulate consideration of a treating relationship if he does not find the opinion as equally persuasive as another opinion. See 20 C.F.R. § 404.1520c(b)(2).  "[A]lthough ALJs are no longer directed to afford controlling weight to treating source opinions—no matter how well supported and consistent with the record they may be—the regulations still recognize the foundational nature of the observations of treating sources, and consistency with those observations is a factor in determining the value of any [treating source's] opinion." Amanda R. v. Comm'r of Soc. Sec., 556 F. Supp. 3d 145, 155 (N.D.N.Y. 2021) (quoting Shawn H. v. Comm'r of Soc. Sec., 2020 WL 3969879, at *6 (D. Vt. July 14, 2020)) (additional citation omitted).  It is worth noting that the ALJ referenced Ms. McBeth's "treating relationship" but did not acknowledge NP Shue's treatment relationship despite them treating plaintiff for roughly the same amount of time.  T. at 25-26, 1899.

rendered "before [p]laintiff began psychiatric treatment" and "15 months prior to the ALJ's decision." Dkt. No. 15 at 24, 30.

"[W]hen assessing a claimant's RFC, an ALJ is entitled to rely on opinions from both examining and non-examining State agency medical consultants because these consultants are qualified experts in the field of Social Security disability." David B. C. v. Comm'r of Soc. Sec., No. 1:20-CV-01136 (FJS/TWD), 2021 WL 5769567, at *11 (N.D.N.Y. Dec. 6, 2021), report and recommendation adopted, 2022 WL 267348 (N.D.N.Y. Jan. 28, 2022). "In general, an ALJ should not rely on medical source opinions that are 'conclusory, stale, and based on an incomplete medical record.'" Jason J. v. Kijakazi, No. 1:20-CV-01298 (NAM), 2021 WL 5356308, at *8 (N.D.N.Y. Nov. 17, 2021) (quoting Fambo v. Comm'r of Soc. Sec., 474 F. Supp. 3d 603, 608 (W.D.N.Y. 2020)). "However, even a more dated opinion may constitute substantial evidence if it is consistent with the record as a whole notwithstanding its age." Id. (citation and quotation marks omitted).

Dr. Tatar and Dr. Reynolds completed plaintiff's initial determinations on December 17, and 20, 2018. See T. at 103, 105. The letters and opinions from plaintiff's treating providers were not submitted until 2019. See id. at 1455, 1451, 1457, 1899. As to plaintiff's physical impairments, Dr. Reynolds reviewed Dr. Ganesh's consultative examination and plaintiff's treatment records from 2016 through 2018. See id. at 93-98, 102-103. Although more records, NP Barkley's opinion, and NP McIlvain's opinions were submitted after Dr. Reynolds' determination was completed, plaintiff does not argue that his conditions worsened or that the records and opinions contain information not already known by Dr. Reynolds such that his determination could not be

relied on by the ALJ.  See Dkt. No. 15 at 24; cf. Jason J., 2021 WL 5356308, at *8 (remanding where the "[p]laintiff claims that his cervical spinal condition and migraine headaches worsened in late 2017 and 2018. . . .  While the Court cannot say with certainty whether the above records would have changed the [consultants'] opinions . . ., it is clear that they did not have a complete picture of [the p]laintiff's condition.").  As such, there is no inherent error in the ALJ's reliance on Dr. Reynolds' determination, despite it being completed fifteen months before the ALJ's decision.  However, the ALJ did not explain what Dr. Reynolds relied on his coming to his determination and did not explain the consistency of the determination beyond stating that the opinion was "supported with an explanation" and "consistent with the overall evidence."  T. at 24.  Although the ALJ mentioned the supportability and consistency factors, such conclusory statements are insufficient to satisfy the articulation requirements set forth in 20 C.F.R. § 404.1520c(b)(2).  See Rachel J. v. Comm'r of Soc. Sec., No. 1:20-CV-1091 (DB), 2022 WL 205691, at *6 (W.D.N.Y. Jan. 24, 2022) (citation and quotation marks omitted) ("[T]he ALJ did not sufficiently explain how . . . [the] non-examining opinions are supported by, and consistent with, the record.  The ALJ merely stated that the opinion(s) were consistent with the longitudinal record, except that [the p]laintiff had greater limitations. . . .  The ALJ's failure to explain her reasoning frustrates this Court's efforts to assess the validity of the ALJ's ultimate findings and "does not afford an adequate basis for meaningful judicial review.").

As to Dr. Tatar's mental health determination, Dr. Tatar reviewed only Dr. Shapiro's consultative examination related to plaintiff's mental health.  See T. at 93, 105.  To be sure, Dr. Tatar had the available medical evidence relating to plaintiff's

physical limitations that also conveyed his anxiety and depression.  See id. at 93-98.

For example, plaintiff was assessed for anxiety and depression in June 2018 during his

hospital visit for abdominal pain and sleep apnea.  See id. at 461.  He would appear

anxious or depressed during other hospital visits as well.  See id. at 625, 710, 788, 866,

1033.  It was noted that plaintiff "has had extreme anxiety throughout his life . . . ."  Id. at

768.  However, he generally had a normal mood and affect with intact insight and

judgment.  See id. at 603, 748, 807, 830, 839, 844, 906, 927, 948, 969, 977, 991, 1004,

1058, 1075, 1091, 1093, 1095.  In March 2018, PA McIlvain, his rheumatologist, noted

that his fibromyalgia and pain appeared to be "directly associated" with his disrupted

sleep and anxiety."  Id. at 966.  In March 2019, Patrick Riccardi, M.D., stated that he did

"not think [plaintiff] has any autoimmune disease but that we are dealing with a

fibromyalgia soft-tissue pain syndrome related to his chronic sleep irregularities from his

posttraumatic stress disorder and chronic anxiety."  Id. at 1473.  In September 2019, PA

McIlvain noted that "the best way to manage his fibromyalgia is by managing his

underling anxiety and depression."  Id. at 1469.

Plaintiff's initial consult for psychiatric services was on January 7, 2019.  See T.

at 1477, 1889-1899.  During his mental health treatment sessions, he consistently had

only fair insight and judgment and average impulse control.  See id. at 1801, 1809,

1820, 1828, 1836, 1848, 1855, 1862, 1873, 1883-84.  His mood was occasionally noted

as anxious, sad, or dysthymic.  See id. at 1801, 1809, 1820, 1827, 1835.  In April and

May 2019, his anxiety and depression "symptoms [were] worse."  Id. at 1864, 1857.  In

June 2019, his depression symptoms were improving but his anxiety symptoms were

worse.  See id. at 1850.  His anxiety symptoms included "difficulty concentrating,

fatigue, feelings of losing control, racing thoughts," palpitations, shortness of breath, and fear of dying. Id. at 1859.

Dr. Tatar's opinion cannot constitute substantial evidence where he did not consider the records evidencing worse mental health symptoms or the mental health opinions of record opining greater mental limitations. Contra Renalda R. v. Comm'r of Soc. Sec., No. 3:20-CV-00915 (TWD), 2021 WL 4458821, at *9 (N.D.N.Y. Sept. 29, 2021) ("[T]he mental health records [the p]laintiff identifies, some of which were submitted after [the consultant's] review, do not change the picture of [the p]laintiff's mental functioning, such that the ALJ could no longer rely on the State agency consultant's opinion formulating the RFC."). Dr. Tatar's lack of consideration of the mental health evidence is particularly problematic given the ALJ's conclusory review of Dr. Tatar's determination, where the ALJ stated that the opinion was "supported with an explanation based on the medical evidence record." T. at 24; see Skartados v. Comm'r of Soc. Sec., No. 20-CV-3909 (PKC), 2022 WL 409701, at *9 (E.D.N.Y. Feb. 10, 2022) ("The opinions of [the consultative examiner and state agency consultant] thus did not account for more than a year of time when the medical records suggest a possible decline in [the p]laintiff's ability to function, and it was error for the ALJ not to account for that."). The ALJ's statement is insufficient to conduct meaningful review and this situation demonstrates precisely why that is. See Jackson, 2022 WL 620046, at *19 ("[T]he ALJ did not explain, as the new regulations require, what [the consultative examiner] used to support her opinion and reach her ultimate conclusion, other than stating it is 'internally consistent (supportability). Nor did the ALJ specifically compare other objective medical evidence in the record to [the examiner's] (consistency). . . .

[T]he ALJ thus properly addressed neither supportability nor consistency.").  The ALJ did not explain what medical evidence Dr. Tatar used to support his opinion, and upon examination, it is clear that the only mental health evidence Dr. Tatar had available to review was Dr. Shapiro's opinion.  See T. at 103-105.  Given the ALJ's lack of consideration of the supportability of the various opinions, and Dr. Tatar not having access to plaintiff's mental health providers' opinion or treatment records, the ALJ's conclusions are not supported by substantial evidence.

### 5.  Reliance on Activities of Daily Living

In challenging the ALJ's RFC determination, plaintiff contends that his "limited activities are not consistent with the ability to work a full-time job, 8 hours a day, 40 hours a week" and that the ALJ placed "undue weight" on his activities of daily living. Dkt. No. 15 at 29, 33.  Plaintiff frames this argument twice, once in the context of the ALJ's consideration of Dr. Shapiro's medical opinion, and once in the context of the ALJ's consideration of plaintiff' subjective complaints.  See id. at 29, 33.

"An ALJ may not rely on a claimant's daily activities to discredit her while 'wholly ignor[ing] the qualifications that [the p]laintiff placed on [her] ability to engage in [those] activities.'" Kelly W. v. Kijakazi, No. 3:20-CV-00948 (JCH), 2021 WL 4237190, at *10 (D. Conn. Sept. 17, 2021) (quoting Eldridge v. Colvin, No. 15-CV-3929 (NSR/PED), 2016 WL 11484451, at *15 (S.D.N.Y. June 29, 2016), report and recommendation adopted, 2016 WL 6534258 (S.D.N.Y. Nov. 2, 2016)).  "Furthermore, an ALJ should take into account whether any evidence of daily activities shows that the claimant 'engage[d] in any of these activities for sustained periods comparable to those required

to hold even a sedentary job.'" Id. (quoting Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998)) (additional citations omitted).

The ALJ noted that plaintiff "reported that he is able to prepare food, drive, go out alone, shop, provide pet care, pay bills, count change, manage money, follow written and verbal instructions, provide childcare, bathe, and dress himself." T. at 23 (citing T. at 237-39, 1422-33). The ALJ explained that "[t]hese activities indicated that [plaintiff] has the physical functioning ability to perform the various exertional, manipulative, and postural actions required for work activity at the light exertional level. These activities required a good understanding, application of remembered information, as well as concentration, persistence, and interaction with others." Id. Thus, the ALJ concluded that plaintiff's "activities of daily living suggest that he is able to perform unskilled work activity." Id. The ALJ referenced these activities in finding the state agency consultants' and Dr. Ganesh's opinions to be persuasive, and in discounting some of Dr. Shapiro's findings. See id. at 24-25.

In a separate section of the decision, the ALJ explained plaintiff's subjective complaints that because of his impairments he had "problems lifting, standing, walking, sitting, climbing stairs, kneeling, squatting, reaching, [] using his hands . . . paying attention, finishing what he starts, following written instructions, getting along with family, friends, and remembering things." T. at 21.

In plaintiff's function report he explained that "playing with [his] children has become difficult and painful so [he doesn't as much,]" that he plays "video games and boards games with [his] kids because [he] can no longer run around or crouch down on the floor with them[,]" he "rarely visit[s] family and friends out anymore[,]" "if [he] go[es]

out to shop then [he] brings someone to help usually[,]" his "children do the physical labor of chores and he "just make[s] sure it gets done[,]" he goes out alone "[a]s long as [he does not] have to carry anything or lift anything[,]" he eats "a lot of granola, peanut butter on toast, granola bars and fresh fruit, vegetables (fresh).  Anything [he] eat[s] that [he] can fix for [himself] if very simple[,]" his wife prepares the meals that "require any kind of preparation," and he "isolate[s] a lot more than [he] used to."  T. at 238-40. Further, plaintiff explained that it was painful to sit on the toilet and "difficult to get up from [the] toilet[,]" his "wife has had to help [him] off the toilet[,]" washing his feet "is very difficult and painful" and he has to sometimes "sit down in the shower to do this because bending over hurts, and balancing [him]self is difficult[,]" it is "[d]ifficult and painful to bend over and put pants and shoes on" and to lift his arms over his head to put a shirt on, and he asks his children to feed the dogs and let them out but he "occasionally let[s] them out in [the] backyard to run around."  Id. at 236-37.

During his hearing, plaintiff explained that he does not hang out with his friends "nearly as much as [he] used to.  [He] avoid[s] people a lot.  [He] occasionally see[s] friends."  T. at 70-71.  The ALJ asked plaintiff, "[i]t says . . . here you spend your days doing chores, reading, playing fantasy football, watching TV, playing video or board games, your children, helping them with their homework."  Id. at 70.  Plaintiff responded, "Yeah.  I do.  I try to help the kids with their homework.  I spend a lot of time on my phone.  I try to read a lot.  I get side tracked a lot and putting stuff down and finding it later and remembering I was doing stuff."  Id.  Plaintiff's representative asked, "[a]nd when the judge was asking you about chores, what kind of chores do you do around the house?"  Id. at 72.  Plaintiff stated, "I actually don't know where that came from.  I don't

do chores.  You know, I may – you know, pick up some things that I see laying around the house but I am not able to, you know, push a broom or work the lawn mower or anything like that.  I mean, those types of things cause me a lot of pain."  Id.  Plaintiff also explained that he does grocery shop but he "typically has somebody with [him] to do the lifting and bending and . . . pushing of the cart and things of that nature."  Id. at 73.  Plaintiff also testified that he "lay[s] down a lot when [he] read[s].  It helps with the back pain and everything anyway."  Id. at 74.  Plaintiff stated, "I don't leave the house much.  I isolate a lot.  I am kind of embarrassed about this but I have trouble leaving the house during the day.  I get really, really anxious.  I am afraid I might run into someone I know and have to explain what I have been up to . . . ."  Id. at 73.

"The ALJ appears to have disregarded [plaintiff's] qualifying and contextualizing of h[is] daily activities."  Kelly W., 2021 WL 4237190, at *10.  The ALJ stated that plaintiff was able to shop, dress, bathe, do chores, and perform childcare but did not relay the considerable number of caveats that plaintiff wrote and testified to related to each activity.  See T. at 23.  Although the ALJ acknowledged plaintiff's general assertions that he has "problems" lifting, standing, walking, sitting, kneeling, squatting, reaching, and using his hand, the ALJ did not discuss these problems in relation to his activities of daily living.  Id. at 21, 23.  Further, the ALJ discounted Dr. Shapiro's findings related to plaintiff "ability to regulate his emotions and control his behavior" based, in part, on his "ability to socialize [and] his reported activities of daily living[.]"  Id. at 25.  That conclusion is not supported by substantial evidence where plaintiff indicated in his function report, during his consultative examination, and at his hearing that he is limited in all of the activities, and he does not socialize as much anymore and isolates himself

instead.  See id. at 70-71, 73, 238-40, 1425.  It is true that "while 'a claimant need not

be an invalid to be found disabled under the Social Security Act,' consideration of daily

activities are fair game when assessing the intensity and persistence of a plaintiff's

symptoms[.]"  Julie B. v. Comm'r of Soc. Sec., No. 5:20-CV-977, 2022 WL 58384, at *7

(N.D.N.Y. Jan. 6, 2022) (quoting Balsamo, F.3d at 81 (cleaned up); Coger v. Comm'r of

Soc. Sec., 335 F. Supp. 3d 427, 436 (W.D.N.Y. 2018)).  However, the ALJ cannot justify

his decision by relying on plaintiff's activities of daily living "without taking account of the

caveats and limitations []he consistently asserted."  Kelly W., 2021 WL 4237190, at *11;

see also Paul G. v. Comm'r of Soc. Sec., No. 5:18-CV-1054 (TJM), 2020 WL 9848451,

at *8-9 (N.D.N.Y. Mar. 17, 2020) (citations and quotation marks omitted) ("The ALJ's

statement that [the p]laintiff cared for two dogs is an overstatement or exaggeration of

the evidence received at the hearing, . . . and does not provide substantial evidence

supporting the ALJ's determination to afford [certain] opinions very little weight. . . .

While some of the activities of daily living that Plaintiff actually performs might support

the RFC, supra, [t]he ALJ cannot pick and choose evidence in the record that supports

his conclusions.").  Accordingly, remand is warranted.[10]

---

[10] Plaintiff's brief contains a separate section arguing that "[t]he ALJ failed to properly evaluate plaintiff's subjective statements[.]"  Dkt. No. 15 at 31.  The two arguments raised within address the ALJ's consideration of plaintiff's activities of daily living and the lack of objective evidence relating to her fibromyalgia symptoms.  See id. at 32.  As the Court has analyzed these issues and found that the ALJ did not sufficiently consider the medical opinions as required by the regulations, the full extent of plaintiff's activities of daily living, or the entire breadth of records indicating plaintiff's fibromyalgia symptoms, the Court needs not readdress the issues under a different subheading.  Remand is warranted for the Commissioner to address all of the issues outlined herein as they relate to plaintiff's RFC determination which is comprised of the ALJ's consideration of plaintiff's subjective complaints and the medical opinions of record.  See Dumas v. Comm'r of Soc. Sec., No. 7:13-CV-1099 (GTS/TWD), 2015 WL 1403342, at *13 (N.D.N.Y. Mar. 26, 2015) ("Part and parcel to the RFC determination is the ALJ's review of the medical opinion evidence and the credibility of [the p]laintiff.").

## V. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**ORDERED**, that plaintiff's motion for judgment on the pleadings, Dkt. No. 15, is **GRANTED**; and it is further

**ORDERED**, that defendant's cross-motion for judgment on the pleadings, Dkt. No. 16, is **DENIED**, and the matter is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for further proceedings consistent with this Memorandum-Decision & Order.

**IT IS SO ORDERED.**

Dated: May 31, 2022
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge